IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JANET BLACKMON,           )
                          )
        Plaintiff,        )
                          )
v.                        )        CASE NO. 1:16-cv-572-GMB
                          )        [WO]
L-3 ARMY SUSTAINMENT LLC, )
                          )
        Defendant.        )

## MEMORANDUM OPINION AND ORDER

Before the court is a motion for summary judgment filed by Defendant L-3 Army

Sustainment LLC ("L-3") on June 29, 2017. Doc. 41.  Having reviewed the motion, the

parties' briefs, the evidentiary record, and the applicable law, the court finds that L-3's

motion is due to be GRANTED, as set forth below.

## I.  STATEMENT OF FACTS

The facts are derived from L-3's statement of undisputed facts, Plaintiff Janet

Blackmon's additional statement of facts, and uncontroverted record evidence.  The

majority of the facts are taken from the deposition of Blackmon and from the corporate

documents of L-3.  The court must construe the facts and all reasonable inferences arising

therefrom in the light most favorable to Blackmon as the nonmovant. *See Frederick v.

Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

The court has reviewed the record, including the parties' filings and evidentiary

submissions, to determine whether genuine issues of material fact exist to be tried.

However, the court need not "scour the record" to make that determination. *Tomasini v.*

*Mt. Sinai Med. Ctr. of Fla.*, 315 F. Supp. 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation marks omitted). Indeed, the court's June 30, 2017 briefing order requires that "any discussion of evidence in a brief must include the specific reference, by name or document number and by page and paragraph or line, to where the evidence may be found in the supporting evidentiary submission or in any document filed with the court." Doc. 42 at 2. To the extent the parties' filings do not comply with these directives, the court may refuse to consider the referenced evidence or may strike it from the record entirely. *See* Doc. 42.

Against this backdrop, and for summary-judgment purposes only, *see Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), the court sets forth the following facts:

## A.     The Parties and the Relationship Between L-3 and the Ft. Rucker Workforce

Blackmon is a former aircraft mechanic who was 54 years old at the time of her termination.[1] Docs. 41-2 at 79 & 46-22 at 24. The basis of this lawsuit is Blackmon's alleged discriminatory termination based on her age. Doc. 1.

L-3 is a military contractor. Doc. 41-1 at ¶ 4. L-3 has a contract with the United States Army to provide aircraft maintenance, support, and logistics services in connection with the Army's operations at Ft. Rucker, Alabama. Doc. 41-1 at ¶ 4. L-3 was awarded

---

[1] There is no dispute that Blackmon's employment with L-3 ended by virtue of her resigning in lieu of being terminated. Docs. 46-17 & 46-18. However, the distinction between whether Blackmon resigned or was terminated is not material to resolving the instant summary-judgment motion, as L-3 concedes it would have terminated her employment had she not resigned and, more importantly, neither party disputes that Blackmon was subject to an adverse employment action—a necessary element of her *prima facie* case. For these reasons, the undersigned will refer to the cessation of Blackmon's employment with L-3 as a termination.

the contract to provide these services at Ft. Rucker in 2003 and has been the prime contractor for these services since that time. Doc. 41-1 at ¶ 4.

L-3's workforce at Ft. Rucker is unionized. The bargaining unit is represented by codefendant United Lodge No. 2003, International Association of Machinists and Aerospace Workers ("IAMAW").[2] Doc. 41-1 at ¶ 6.

The relationship between L-3 and IAMAW is governed by a collective bargaining agreement. Docs. 41-1 at ¶ 7 & 41-3. L-3 and IAMAW have also agreed upon a set of work rules that govern employee conduct. Docs. 41-4, 41-5 & 46-16. These rules encompassed Blackmon's responsibility to keep and to record her time accurately, a responsibility this is "self-policed." Docs. 41-2 at 29−30, 41-8 & 46-16. Other work rules relevant to Blackmon's claim are:

| | |
|---|---|
| Work Rule 13 | Employees will not leave assigned work area without authorization for reasons not connected with performance of their job. |
| Work Rule 21 | Employees will not leave the facility during working hours without authorization. |
| Work Rule 38 | Employees will not commit any form of dishonesty or fraud; including falsifying facts to management, or falsifying employment application, personal, personnel, company or government records. |

Doc. 46-16. The stated consequence for violating Work Rules 13 and 21 is progressive discipline up to discharge. Doc. 46-16. The stated consequence for violating Work Rule 38 is discharge. Doc. 46-16.

---

[2] IAMAW was dismissed from this lawsuit on July 17, 2017. *See* Doc. 48.

Blackmon testified that she understood L-3's work rules, that it was her responsibility to follow them, and that she understood the consequences if she did not follow them. Docs. 41-2 at 6−9 & 41-6. Blackmon also understood that it was her duty to follow L-3's Code of Ethics and Business Conduct, which provides, among other things, that employees shall accurately record their time and labor charges. Docs. 41-2 at 8−19, 41-7 & 41-9.

## B. Blackmon's Employment with L-3

Blackmon began working in connection with the contract at Ft. Rucker in 1989. Doc. 46-22 at 3. From then until 2003, she worked for two of L-3's predecessor contractors—Sikorsky and DynCorp. Doc. 46-22 at 3. Blackmon worked on the contract for L-3[3] as an aircraft mechanic from 2003 until July 13, 2015, when she was terminated. Doc. 46-22 at 4. From June 2014 through her termination, Blackmon served as an aircraft mechanic at Lucas Stagefield, which was only 1.1 miles from her residence in Elba, Alabama. Doc. 46-22 at 4−6. Blackmon worked the second shift from 3:00 p.m. until 11:30 p.m. and had a 30-minute meal break. Docs. 41-2 at 22−24 & 46-22 at 14. As a stagefield mechanic, Blackmon had a large amount of downtime each shift.[4] Doc. 41-1 at 38−39.

---

[3] Blackmon testified that she was hired by Army Fleet Support ("AFS"), a "subsidiary" of L-3, and the parties refer to AFS and L-3 interchangeably when discussing Blackmon's employer. Doc. 46-22 at 4. However, for purposes of this opinion, the court will refer to Blackmon's employer as L-3.

[4] While many of L-3's employees work directly at the airfields located on Ft. Rucker (called "home base"), many employees are assigned to "stagefields," which are remote air fields located away from Ft. Rucker. Typically, the helicopters stay at the home base on Ft. Rucker where the majority of maintenance is performed. Doc. 46-22 at 6. When the Army is ready to use the helicopters, the Army's instructors and pilots-in-training fly them from the home base to one of the remote stagefields where they practice maneuvers and undergo training. Doc. 46-22 at 6. Mechanics assigned to home base perform the majority of maintenance; stagefield mechanics, on the other hand, have a significant amount of downtime. Doc. 46-22 at 6. Indeed, a stagefield mechanic's primary task is to be ready to work in the event of unexpected

During this downtime, she would usually sit in the stagefield's fire house and watch television for several hours. Doc. 46-22 at 7.

Blackmon contends that it was understood that stagefield mechanics could leave when incoming flights were not scheduled. More specifically, Blackmon testified that she was told by her immediate supervisor, Danny Foxworth, that she could leave early on days when inbound flights to her stagefield were cancelled without asking a supervisor first. Doc. 46-22 at 8–9 & 13. Even when stagefield mechanics left the field for an extended period of time or went home early, they still claimed a full eight hours of work, according to Blackmon. Docs. 41-2 at 28–29 & 46-22 at 8–10. She contends this was compensation for hours the stagefield mechanics worked over their shifts without claiming overtime pay. Doc. 46-22 at 8 & 11. While there is no dispute that this procedure was a violation of L-3's labor reporting policy, Blackmon understood it to be the normal operating procedure for stagefield mechanics. Docs. 41-2 at 28–29 & 46-22 at 11–13.

However, Blackmon had two other supervisors during the relevant time period— Steve Greenwood and Dave Mildenstein. Doc. 46-22 at 9. Blackmon testified that neither Greenwood nor Mildenstein told her that she could leave her stagefield after inbound flights were cancelled without asking permission from her supervisor first. Doc. 41-2 at 32–33. There is also no evidence that Foxworth or any other supervisor instructed Blackmon to claim a full eight hours of work on days she left for an extended period of

---

maintenance or repairs. Doc. 46-22 at 6. Stagefield mechanics are not directly supervised in person because their supervisors are located at home base. Doc. 41-2 at 15. As a result, L-3 expects those employees to use the "honor system" when reporting their hours and whereabouts during shift. Doc. 41-2 at 15–16.

time or ended her shift early after inbound flights were cancelled.

**C.    The Events of July 2, 2015**

On Thursday, July 2, 2015, Blackmon reported to her assigned stagefield at 3:00 p.m. to start her shift. Doc. 41-2 at 34–35.  She remained at the stagefield until 5:45 p.m., when her husband picked her up and they drove to a restaurant about 20 miles away in Enterprise, Alabama for a wedding anniversary dinner. Doc. 46-22 at 16.  They arrived at the restaurant at approximately 6:05 p.m., and Blackmon ordered one or two non-alcoholic margaritas and an entrée. Docs. 41-2 at 37–41, 46-10 & 46-22 at 16–17.  The Blackmons stayed at the restaurant for about 30 minutes, and then Blackmon's husband drove her back to her stagefield. Doc. 41-2 at 36–42.  Blackmon does not dispute that she did not ask permission from a supervisor to leave the stagefield for an hour and ten minutes to eat with her husband because it was her "common practice to leave." Docs. 41-2 at 43–44 & 46-22 at 18.

When Blackmon arrived back at the stage field at approximately 6:55 p.m., Lieutenant Joey Snell, a fireman and non-L-3 employee, told her that flights had been cancelled for the evening and that he was gathering up his equipment. Docs. 41-2 at 44–46 & 46-22 at 18.  Blackmon assumed that Lieutenant Snell was leaving for another stagefield. Doc. 41-2 at 45.  Blackmon got in her truck and went home at approximately 7:00 p.m., where she stayed for the remaining four and a half hours of her scheduled shift. Doc. 41-2 at 44–47.  Blackmon admits that she only worked two hours and 45 minutes on July 2.

Unbeknownst to Blackmon, another L-3 employee, Sabra Distasio, and her father

were at the same restaurant as the Blackmons on July 2, and they saw them eating dinner together. Docs. 41-25 & 46-17. Around 6:15 p.m. that evening, Distasio (who was on scheduled vacation time) called her supervisor, Mildenstein, to ask if Blackmon was scheduled to be off that day. Docs. 41-14 & 41-15 at 3. Mildenstein responded "no" and asked why Distasio was making the inquiry. Docs. 41-14 & 41-15 at 3. Distasio said that she and Blackmon were at the same restaurant and that Blackmon appeared to be drinking alcohol. Docs. 41-14, 41-15 at 3, 46-7 & 46-17. Blackmon disputes that she was drinking alcohol during dinner on July 2, and there is no evidence that Distasio's report that Blackmon was drinking alcohol was based on anything other than Distasio's own speculation. Docs. 46-10, 46-17 & 46-22 at 17. Therefore, the court will construe this fact in the light most favorable to Blackmon and conclude that she was not drinking alcohol during the dinner in question.[5]

Following Distasio's report, Mildenstein asked Foxworth to text Blackmon and ask her to report to Lowe Field (a homefield located on Ft. Rucker). Docs. 41-14 & 41-15 at 4–5. Foxworth texted Blackmon at 6:55 p.m. and asked her to report for training at Lowe Field at 8:00 p.m. Docs. 41-2 at 53−54, 41-13, 46-7 & 46-22 at 20. When Blackmon did not promptly respond, Foxworth went to Blackmon's stagefield to look for her but she was not there. Docs. 41-2 at 48, 41-26 & 46-7.

At 7:49 p.m., Blackmon responded to Foxworth's text, stating that she will try to report for training but she locked her keys in her vehicle when she got to work and was

_____

[5] In any event, the evidence shows that whether Blackmon was drinking alcohol on the night in question did not play a role in L-3's decision to terminate her.

trying to get a locksmith out to the stagefield. Docs. 41-2 at 55–56, 41-13 & 46-22 at 21. Blackmon concedes that her statements to Foxworth in this text about locking her keys in her vehicle at work and trying to get a locksmith were not true.[6] Docs. 41-2 at 37, 56 & 46-22 at 16. Blackmon further admits that she lied to Foxworth because she did not want to drive back to the stagefield after she had already returned home for the night. Doc. 41-2 at 62.

Around this same time (Blackmon believes around 7:10 p.m.), she received a call from Lieutenant Snell advising her that Foxworth had been to the stagefield looking for her. Doc. 41-2 at 48. One of Blackmon's co-workers (whose identity is unclear from the record) told Foxworth that Blackmon was at the store. Doc. 21-21. Sometime later that night, Blackmon called Lowe Field (home base) and spoke to another one of her supervisors, Greenwood. She asked Greenwood if she still needed to report for training that night and he told her "no." In that conversation, Blackmon told Greenwood that she had been at the store when Foxworth had come to look for her earlier that evening, which was not true. Doc. 41-2 at 57–59.

Mildenstein then told Foxworth to text Blackmon again and ask if she needed to report anything to give her a chance to use any leave time. Doc. 41-14. Blackmon did not respond. Doc. 41-14. As a result, Mildenstein instructed Foxworth to give Blackmon an

---

[6] Blackmon now claims that she had indeed locked her keys in her vehicle but had done so at home rather than at work, and that her statement to Foxworth that she had locked her keys in her vehicle at work was made in "error." Docs. 41-2 at 56, 46-1 at 4 & 46-22 at 21. In fact, Blackmon attempts to explain all of her untruths regarding her whereabouts and activities on July 2 as mistakes or confusion on her part. Docs. 41-2 & 46-22.

unexcused absence for July 2. Doc. 41-14.

**D. Blackmon's Termination**

L-3 was closed on Friday, July 3, for the 4th of July holiday. Doc. 41-2 at 49. On Monday, July 6, Blackmon was assigned to work at Lowe Field. Doc. 46-7 at 2. When Blackmon reported for work that day, Mildenstein asked her how many hours she wanted to report for July 2, and she responded "eight." Doc. 46-7 at 3. Blackmon testified that she claimed a full eight hours of work on July 2 even though she only worked two hours and 45 minutes because she had been previously told by Foxworth that, if her flights to her stagefield cancelled, she could go home. Doc. 41-2 at 61.

On Friday, July 10, Blackmon received a text from Anthony Holton, a union representative, telling her that she was scheduled for a meeting at the union hall on Monday, July 13, but giving no advanced notice of the meeting's purpose. Docs. 46-12 & 46-22 at 33. On July 13, Blackmon attended the meeting along with Holton and two other union representatives, Steve Crumb and Jimmy Cotter; Penny Poole, Manager of Labor Relations and Benefits for L-3; Mike Lawson, Director of Human Resources for L-3; and Brad Kitch, Director of Lowe Field. Docs. 41-2 at 63, 41-27 & 41-28. The meeting lasted about 45 minutes to an hour. Docs. 41-2 at 63 & 46-22 at 27–28.

During the meeting, Blackmon was questioned about the events of July 2 and her whereabouts. She began by repeating her untrue statement about having locked her keys in her vehicle at work. Docs. 41-2 at 63–68 & 41-27. When pressed further, Blackmon lied again, this time claiming that she had gone to the store to get some dinner, then went by her house to let her dogs outside, and finally returned to the stagefield; when she

returned to the stagefield, she was told by a coworker that someone had been by looking for her. Docs. 41-2 at 67–68 & 41-27. Blackmon was then directly asked by Lawson whether she had been in Enterprise on July 2, and she responded "no." Docs. 41-2 at 67–69 & 46-22 at 22. Lawson explained that a manager saw her in Enterprise that night, and Blackmon again denied that she was there. Doc. 41-27. Blackmon testified that she made these untrue statements during the meeting because she was under pressure and because she "couldn't remember exactly" what had happened 11 days earlier. Doc. 46-22 at 22, 29.

At this point in the meeting, Cotter requested a break, and he met with Blackmon privately. Docs. 41-2 at 87–89 & 21-27. During this break, Cotter told Blackmon that if she had indeed been in Enterprise that day, she should admit it to the group. Doc. 41-2 at 88. Blackmon then returned to the meeting and admitted that she had been in Enterprise on July 2 eating dinner with her husband. Doc. 41-2 at 88 & 109; Doc. 41-27. Blackmon concedes that her statements during the meeting about her whereabouts on July 2 (*i.e.*, that (1) she had gone to the store to get some dinner; (2) that she had gone by her house to let her dogs out; (3) that she had locked her keys in her vehicle at work; and (4) that she was never in Enterprise eating dinner) were not true. Doc. 41-2 at 68–70. Blackmon clarified that she had locked her keys in her truck, but this happened at home after she had already returned for the night. Doc. 21-27.

Blackmon was then presented with a letter of termination, informing her that she was being terminated for violating Work Rules 13, 21 and 38. Docs. 41-17 & 46-18. Blackmon concedes that the factual statements in the letter of termination are accurate.

Docs. 41-2 at 107 & 46-22 at 31.  She also concedes that she violated Work Rule 38 when she falsely reported to Foxworth that she had locked her keys in her vehicle at work on July 2. Doc. 46-22 at 23.  According to Blackmon, Poole told her that it would be better for her future employment opportunities if she resigned in lieu of termination. Docs. 41-2 at 81 & 46-22 at 26.  Blackmon also alleges that Jimmy Cotter (her union steward and not a member of L-3 management) told her, after the decision had been made to end her employment, that it would be easier to find another job "at her age" if she resigned rather than be terminated. Docs. 41-2 at 81 & 46-22 at 26.  Blackmon prepared a handwritten letter of resignation, which was submitted to and accepted by L-3 on July 13, 2015.[7] Doc. 26-19.  Blackmon testified that she resigned because she "was just wanting to get the hell out of there." Doc. 41-2 at 110.

Blackmon's position was filled by an individual six years older than Blackmon. Docs. 41-1 at ¶ 8 & 41-2 at 90–91.  In turn, the immediate replacement of that individual was 11 years older than Blackmon. Docs. 41-1 at ¶ 9 & 41-2 at 90–91.  In fact, Blackmon's own husband testified that most of the people who work at the stagefields are "on up in age" because you need close to 25 years of seniority to qualify for a position at the stagefields. Doc. 41-12 at 10–11.

### E.    Procedural History

Blackmon filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 30, 2015, alleging that her termination was the result

---

[7] In addition to termination, Blackmon was also suspended for the dates July 13 and 14, 2015. Doc. 46-18.

of age discrimination. Doc. 41-21. Blackmon claims there are two comparators who engaged in similar conduct but were disciplined less severely—Distasio and Daniel Smith. However, Blackmon admits that she has no knowledge or evidence that these two individuals violated Work Rule 38 by lying to management the same way she did. Doc. 41-2 at 104–05.

On May 10, 2016, Blackmon received a notice of rights to sue from the EEOC. Doc. 1. On July 14, 2016, she filed a complaint in this court against L-3 and IAMAW. Doc. 1. IAMAW has already been dismissed from the lawsuit; thus, the only claim remaining is Blackmon's claim against L-3 for age discrimination. Docs. 1 & 48. L-3 has moved for summary judgment on that claim, and Blackmon has responded. Docs. 41, 46 & 49. The parties have consented to the exercise of full jurisdiction by the undersigned United States Magistrate Judge, and the matter is now ripe for resolution by the court. Docs. 27–29.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56 mandates the entry of summary judgment when, after adequate time for discovery and upon motion, a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324

(internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Any factual disputes will be resolved in the nonmoving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts." *Jackson v. City of Homewood, Ala.*, 2015 WL 5011230, at *2 (N.D. Ala. Aug. 21, 2015) (citing *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002)). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat" a properly supported summary-judgment motion. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Nor will "[a] mere 'scintilla' of evidence supporting the opposing party's position . . . suffice; there must be a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242).

## III. DISCUSSION

Blackmon's sole claim against L-3 is for discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). Under the ADEA, it is unlawful for an employer to discharge or otherwise to discriminate against an employee who is at least 40 years old on the basis of her age. *See* 29 U.S.C. §§ 623(a)(1) & 631(a). A plaintiff may support her ADEA claim through either direct or circumstantial evidence. *King v. Adtran*, 626 F. App'x 789, 791 (11th Cir. 2015) (citing *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1270 (11th Cir. 2014)).

In cases like this, where the plaintiff supports her claim with circumstantial evidence,[8] the court applies the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case of age discrimination. *See, e.g.*, *Mazzeo*, 746 F.3d at 1270. If she does this, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* If the employer satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that the proffered reason is merely a pretext for unlawful discrimination. *Id.*

Ultimately, however, to "prevail on an age discrimination claim, the plaintiff must prove by a preponderance of the evidence that [her] age was the 'but for' cause of [her] termination." *King*, 626 F. App'x at 790–91 (citing *Mazzeo*, 746 F.3d at 1270) (alterations in original); *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009) (holding that the language "because of" in the ADEA statute means that a plaintiff must prove that discrimination was the "but-for" cause of the adverse employment action); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (holding that, in the Eleventh Circuit, the *McDonnell Douglas* framework continues to apply to ADEA claims post-*Gross*). In other words, "the plaintiff must prove that her age 'actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role [in the employer's

---

[8] Although Blackmon contends that Cotter told her it would be easier for her to find another job "at her age" if she resigned in lieu of termination, neither party contends that this lone statement by a non-L-3 employee, made after L-3 had already decided to end Blackmon's employment, is sufficient to constitute direct evidence of age discrimination. Instead, both parties rely on circumstantial evidence, which is analyzed under the burden-shifting *McDonnell Douglas* framework. Docs. 41 & 46-21.

decisionmaking] process and had a determinative influence on the outcome.'" *Brown v. Northside Hosp.*, 311 F. App'x 217, 222 (2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks omitted) (alteration in original)).

There is no dispute that Blackmon has established the first three elements of her *prima facie* age claim—(1) she was a member of the protected class of persons between the ages of 40 and 70 (she was 54 at the time of termination); (2) she was subject to an adverse employment action (she was terminated); and (3) she was qualified to do the job from which she was terminated (she was an aircraft mechanic for L-3 for more than ten years). *E.g.*, *Horn v. United Parcel Serv., Inc.*, 433 F. App'x 788, 792 (11th Cir. 2011). What the parties dispute is whether Blackmon has met her burden with respect to the fourth and final element of her *prima facie* case. L-3 contends that Blackmon must prove that she was replaced by someone substantially younger and that such a showing is the only way Blackmon can establish the final element of her *prima facie* case. *See* Doc. 41. Blackmon, on the other hand, contends that she is not required to show at the *prima facie* stage that someone substantially younger filled the position from which she was discharged; rather, she can meet this burden by identifying a similarly situated comparator outside of her protected class who was treated more favorably than her. *See* Doc. 46-1.

The court agrees with Blackmon that she does not have to show that she was replaced by a substantially younger person to meet the final element of her *prima facie* case. *See Washington v. United Parcel Serv., Inc.*, 567 F. App'x 749, 751 (11th Cir. 2014); *see also Pettigrew v. Atlanta Indep. Sch. Sys.*, 2017 WL 3446299, at *6 (N.D. Ga. June 19,

2017).  The Eleventh Circuit has explained that, "even if a plaintiff is not replaced by a member outside [her] protected class, [she] may still satisfy the last prong of the *prima facie* case requirement by identifying similarly situated comparators outside of [her] protected class who were treated more favorably." *Horn*, 433 F. App'x at 792 (citing *Nix v. WLCY Radio/Rahall Comm'ns*, 738 F.2d 1181, 1185–86 (11th Cir. 1984)).  There is no dispute that Blackmon's position was filled by someone older than Blackmon.  Doc. 41-1 at ¶ 8–9.  Thus, for Blackmon to meet her burden with respect to the final element of her *prima facie* case, she must identify a similarly situated comparator outside of her protected class who was treated more favorably than her.  Blackmon has failed to make such a showing.

"A relevant comparator is an employee who is similarly situated to the plaintiff 'in all relevant respects.'" *Horn*, 433 F. App'x at 792 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).  "In determining whether a comparator is similarly situated, we inquire 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Id.* (quoting *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006)).  "And '[w]hen making that determination, we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions.'" *Id.* (quoting *Burke-Fowler*, 447 F.3d at 1323).

Blackmon identifies two comparators in an attempt to meet the fourth element of her *prima facie* case—Sabra Distasio and Daniel Smith.  Both Distasio and Smith are stagefield mechanics who are substantially younger than Blackmon.  They are not similarly

situated comparators, however, because they did not engage in nearly identical conduct. Blackmon was terminated for violating Work Rules 13, 21, and 38, but it is apparent from the evidence that the primary basis for her termination was her violation of Work Rule 38 by repeatedly lying to her supervisors and L-3 management. Indeed, Blackmon was untruthful to her employer on several occasions between July 2 and July 13, the date of her termination, including (1) admittedly lying to Foxworth on July 2 when she texted him that she may not be able to make it to Lowe Field for training later that night because she had locked her keys in her vehicle at work and was trying to get a locksmith there;[9] (2) telling Greenwood on July 2 that she was at the store when Foxworth was looking for her at the stagefield; (3) telling Mildenstein on July 6 that she was claiming eight hours of work for July 2 when she had been at the stagefield for less than three hours; (4) telling L-3 management during the group meeting on July 13 that she had locked her keys in her vehicle at work; (5) telling L-3 management during the group meeting on July 13 that she had gone to the store on July 2 to get dinner, had gone by her house, and then returned to the stagefield only to learn that Foxworth had been at the stagefield looking for her; and (6) repeatedly telling L-3 management during the group meeting on July 13 that she was not in Enterprise on July 2 (only to later admit that she was).

There is no evidence that Distasio or Smith violated Work Rule 38 in such an

---

[9] Blackmon claims that this untruth was not intentional but was the result of her "mistexting" Foxworth on July 2 that she had locked her keys in her truck at work (rather than at home). However, when presented with the opportunity to correct this misstatement at the July 13 meeting, Blackmon did not; she instead repeated that she had locked her keys in her truck while at work on July 2. She also admitted in her deposition that she told Foxworth this because she did not want to drive back to the stagefield from her house.

egregious manner as Blackmon and received less severe discipline. Blackmon claims that Smith perpetuated a similar lie when he left his work area to get a snack at the store during scheduled or volunteered overtime because he allegedly "didn't know any better." Doc. 46-21. Blackmon argues that Smith should not be able to claim that he "didn't know any better" when he would have read and acknowledged the work rules that prohibit leaving the work area without prior authorization. This argument fails for several reasons.

First, Blackmon presumes that Smith read and acknowledged the relevant work rules without pointing to any evidence that he, in fact, did. Doc. 46-21 at 15–16 ("Mr. Smith would have certainly read and acknowledged the rules."). More significantly, Smith and Blackmon did not engage in "nearly identical" misconduct. There is evidence that Smith left his work area (after Blackmon had already been terminated) for a few minutes on one occasion and was suspended, while Blackmon was gone for over five hours of her eight-hour shift on July 2, lied about her whereabouts to her supervisors and L-3 management when questioned, and then claimed a full eight hours of pay when she worked less than three hours that day. Even if the court generously construed Smith's claim that he left his work station because he "didn't know any better" as an untruth, this pales in comparison to the series of lies that Blackmon repeatedly told her supervisors and L-3 management. More importantly, the undisputed evidence shows that Smith admitted to having left his work station when asked; there is no evidence that he lied about it, repeatedly, to multiple different supervisors and members of management. There is also no evidence that Smith falsified his time card on the day he went to the store in violation of Work Rule 38 or that the decisionmakers were aware of Smith's activities at the time

they terminated Blackmon. Doc. 41-2 at 104. Indeed, it would have been impossible for the decisionmakers to have been aware of Smith's misconduct at the time Blackmon was terminated because his misconduct occurred after her termination. Doc. 41-2 at 89–90; *see Smith v. Int'l Paper Co.*, 160 F. Supp. 2d 1335, 1345 (M.D. Ala. 2001) (explaining that disparate treatment cannot be shown without first showing that the employer was aware of the comparator's misconduct). In short, even when drawing all reasonable inferences in Blackmon's favor, the quantity and quality of Smith's misconduct in no way matches Blackmon's. Thus, he cannot be considered a similarly situated comparator.

Distasio also is not a sufficient comparator. Blackmon claims that Distasio has repeatedly falsified time cards and lied to L-3 management about the hours she worked. To support this claim, Blackmon submitted hours of surveillance footage she and her husband captured while they were "hunting" Distasio after Blackmon was terminated. However, even if the court assumes that the video footage submitted by Blackmon is accurate and credible, Blackmon concedes that this evidence was captured after her termination. *See Young v. CareAlliance Health Servs.*, 2014 WL 4955225, at *8 (D.S.C. Sept. 29, 2014) (rejecting plaintiff's claim that she had put forth evidence from which a reasonable jury could conclude that she was terminated because of her disability when comparator misconduct occurred after she had already been terminated).

Moreover, even considering Blackmon's evidence that Distasio was away from her work station for an impermissible amount of time on September 9 and 24, 2015 and June 22, 2016, there is no evidence that she did not have permission to be away from her work station for these amounts of time. Doc. 41-2 at 92. There is no substantiated evidence that

Distasio falsified time-cards, as Blackmon claims, and no evidence that Distasio violated Work Rule 38 in a similar manner as Blackmon. Indeed, there is no evidence that she was asked by her supervisors and other L-3 management whether she was away from her work station for an impermissible amount of time on the days in question without prior approval and she repeatedly lied about it. Doc. 41-2 at 105. There is also no evidence that any of the decisionmakers in Blackmon's case were aware of Distasio's purported misconduct at the time the decision was made to terminate Blackmon's employment. Doc. 41-2 at 89; *see Howell v. Morrison Mgmt. Specialists, Inc.*, 2013 WL 6568935, at *25 (N.D. Ala. Dec. 13, 2013) ("At a minimum, the plaintiff must show not only that the other employee was involved in or accused of the same or similar conduct and disciplined differently, but also that the employer was aware of the would-be comparator's misconduct.") (internal quotation marks and citation omitted).

In short, because Blackmon's misconduct is materially different in quantity and quality from that of Smith and Distasio—the only two purported comparators—Blackmon has failed to establish the fourth element of her *prima facie* case—that similarly situated comparators who were younger engaged in similar misconduct but were not terminated. *See Jackson*, 2015 WL 5011230, at *7 (granting summary judgment in employer's favor when comparators did not engage in nearly identical conduct); *see also Horn*, 433 F. App'x at 794–96 (holding that district court correctly concluded that the plaintiff had failed to make out *prima facie* case of age discrimination when comparators were not similarly situated because they had not been involved in or accused of nearly identical misconduct and disciplined less severely); *Miller-Goodwin v. City of Panama City Beach*, 385 F. App'x

966, 973 (11th Cir. 2010) (holding that comparators did not establish causation because "there has been no showing that any [comparator] violated all of the Rules and Regulations that resulted in [plaintiff's] termination or that their alleged misconduct was nearly identical to [plaintiff's]").  Moreover, because Blackmon has not proffered any other evidence indicating that L-3 discharged her because of her age, she has wholly failed to demonstrate that her age actually motivated L-3's decision to terminate her.  Accordingly, summary judgment is due to be granted in L-3's favor on Blackmon's age discrimination claim.

## IV. CONCLUSION

For the reasons set forth above, it is ORDERED that Defendant L-3 Army Sustainment LLC's motion for summary judgment (Doc. 41) is GRANTED.  It is further ORDERED that the pretrial hearing currently scheduled for September 13, 2017 is CANCELLED.

A final judgment consistent with this opinion will be entered separately.

DONE this 7th day of September, 2017.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE